**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| *Johnson et al. v. Physicians to Women, Inc. and* *Mid-Atlantic Women's Care, PLC* | Case No. 7:24-cv-00144-MFU-CKM  **CLASS ACTION**  **DEMAND FOR JURY TRIAL** |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Latoya Johnson, Janet Hall, and Virginia Trupia- Lash ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following Class Action Complaint (the "Action") against Defendants Physicians to Women, Inc. ("PTOW") and Mid-Atlantic Women's Care, P.L.C. (MAWC), (collectively "Defendants") upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel as follows:

## I.     INTRODUCTION

1.     Plaintiffs seek monetary damages and injunctive and declaratory relief arising from Defendants' failure to safeguard the Personally Identifiable Information[1] ("PII") and Protected Health Information ("PHI") (together, Private Information") of their patients, which resulted in unauthorized access to their information systems on or around April 4, 2023 and the compromised

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."17 C.F.R. § 248.201(b)(8). To be clear, according to Defendants, not every type of information included in that definition was compromised in the subject data breach.

and unauthorized disclosure of that Private Information, causing widespread injury and damages to Plaintiffs and the proposed (defined below) members.

2.     Defendant, PTOW, is a Virginia corporation specializing in obstetric and gynecologic care in Roanoke, Virginia since 1940.[2]  According to PTOW's Notice of Security Incident letter, PTOW is "a division of Mid-Atlantic Women's Care, PLC ("MAWC").[3]

3.     Defendant, MAWC, is a Virginia limited liability company that offers obstetric and gynecologic care to patients in the Hampton Roads region.[4]

4.     As explained in detail herein, Defendants detected unusual activity in their computer systems and ultimately determined that an unauthorized third party accessed their network and obtained certain files from their systems on or around April 4, 2023 ("Data Breach").[5]

5.     As a result of the Data Breach, which Defendants failed to prevent, the Private Information of Defendants' patients, including Plaintiffs and the proposed Class members, were stolen, including their Name, Social Security numbers, date of birth, and medical/health information.[6]

6.     Defendants' investigation concluded that the Private Information compromised in the Data Breach included Plaintiffs' and other Class Members information (together, "Patients").

7.     Defendants' failure to safeguard Patients highly sensitive Private Information as exposed and unauthorizedly disclosed in the Data Breach violates their common law duty, Virginia law, and Defendants' implied contract with their Patients to safeguard their Private Information.

---

[2] https://www.ptow.com(last accessed Feb. 13, 2024).
[3] The "Notice Letter." Attached hereto as *Exhibit A.*
[4] https://www.midatlanticwomenscare.com/about/ (last accessed July 16, 2024).
[5] *See Exhibit A.*

8.      Plaintiffs and Class members now face a lifetime risk of identity theft due to the nature of the information lost, which they cannot change, and which cannot be made private again.

9.      Defendants' harmful conduct has injured Plaintiffs and Class members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive Private Information.

10.      Defendants' failure to protect Patients' Private Information has harmed and will continue to harm thousands of Defendants' Patients, causing Plaintiffs to seek relief on a class wide basis.

11.      On behalf of themselves and the Class preliminarily defined below, Plaintiffs bring causes of action against Defendants for negligence, negligence *per se*, breach of fiduciary duty, and breach of implied contract, seeking an award of monetary damages and injunctive and declaratory relief, resulting from Defendants' failure to adequately protect their highly sensitive Private Information.

## II.    JURISDICTION AND VENUE

12.      The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, and at least one Class member is a

citizen of a state that is diverse from Defendants' citizenship.[7] Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

13.     This Court has personal jurisdiction over Defendant, Physicians to Women, Inc., because it is a corporation incorporated under the laws of Virginia, has its principal place of business in Virginia, and does a significant amount of business in Virginia.

14.     This Court has personal jurisdiction over Defendant Mid-Atlantic Women's Care, PLC because it is a limited liability company formed under the laws of Virginia, and has its principal place of business in Virginia, and does a significant amount of business in Virginia.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant Physicians to Women has its principal place of business located in this District, and a substantial part of the events giving rise to this action occurred in this District.

### III.     PARTIES

16.     Plaintiff Latoya Johnson is an individual citizen of Virginia and received a Notice from Defendants dated January 26, 2024. Plaintiff was a patient of PTOW.

17.     Plaintiff, Janet Hall is an individual citizen of Virginia and received a Notice from Defendants dated January 26, 2024. Plaintiff is a patient of PTOW.

18.     Plaintiff, Virginia Trupia-Lash is an individual citizen of Virginia and received a Notice from Defendants dated January 26, 2024. Plaintiff is a patient of PTOW.

19.     Defendant Physicians to Women, Inc., is a corporation organized under the laws of Virginia with its headquarters and principal place of business at 21 Highland Avenue, Suite 200, Roanoke, Virginia 24013.

---

[7] According to the breach report submitted to the Massachusetts state government, 14 Massachusetts residents were impacted in the Data Breach at Mid-Atlantic Women's Care. See https://www.mass.gov/doc/data-breach-report-2024/download

20.     Defendant Mid-Atlantic Women's Care, PLC, is a limited liability company formed under the laws of Virginia with its principal place of business at 6353 Center Drive, Suite 100, Norfolk, Virginia 23503.

## IV.    FACTUAL ALLEGATIONS

### Defendants' Business

21.     According to Defendant Physicians to Women's website:

Physicians to Women, a division of MAWC, has specialized in obstetric and gynecologic care in Roanoke, Virginia since 1940.  We serve patients in the Roanoke Valley, Salem, Vinton, Botetourt, Franklin County, and outlying areas.[8]

22.     According to Defendant Mid-Atlantic Women's Care's website:

Mid-Atlantic Women's Care, the premier OB/GYN group in Hampton Roads, was created in 1997 by the merger of 11 independent OB/GYN physician groups. Today, this group of over 140 providers, serves a geographic area from northeastern North Carolina to Hampton Roads to as far west as Roanoke, Virginia.[9]

23.     Plaintiffs and Class members are current or former Patients who provided their Private Information to Defendants.

24.     Prior to receiving services from Defendants, Plaintiffs and Class Members were required to and did, in fact, turn over their PII.

25.     The information held by Defendants at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class members.

26.     Upon information and belief, Defendants made promises and representations to their Patients that the Private Information collected would be kept safe and confidential, the privacy of that information would be maintained, and Defendants would delete any sensitive information after it was no longer required to maintain it.

---

[8] https://www.ptow.com/ptow-ourproviders.php (last accessed Feb. 13, 2024)
[9] https://www.midatlanticwomenscare.com/about/ (last accessed July 16, 2024).

27.     Plaintiffs and Class members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

28.     Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

29.     Defendants had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class members from involuntary disclosure to third parties. Defendants have a legal duty to keep Patients' Private Information safe and confidential.

30.     Defendants had obligations under the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiffs and Class members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

31.     Defendants derived a substantial economic benefit from collecting Plaintiffs' and Class members' Private Information. Without the required submission of Private Information, Defendants could not perform the services they provide.

32.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class members' Private Information from disclosure.

33.     Indeed, PTOW acknowledges in its Privacy Policy that it is required to "maintain the privacy of your health information." [10]

34.     Further, MAWC states in its Notice of Privacy Practices that it is "committed to protecting" its patients medical information and acknowledges that it is "required by law to maintain the privacy of protected health information" and to"let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[11]

### *The Attack and Data Breach*

35.     On or about January 26, 2024, PTOW and MAWC began notifying Patients of the Data Breach, informing them by Notice of Security Incident ("Notice")[12]:

### What Happened?

On, or around April 4, 2023, MAWC[13] was notified of suspicious activity within PTOW's network. In response, we immediately took steps to secure our systems and initiated an investigation into the nature and scope of the event with the assistance of third-party computer forensic specialists. The investigation determined that an unauthorized actor gained access to certain systems in PTOW's network and acquired certain files from those systems on April 4, 2023. We identified the affected files and engaged a data review vendor to conduct a comprehensive and time-consuming review of the files in order to identify the type of information contained therein, and to whom the information relates. On July 5, 2023, we received the results of this extensive review process from the data review vendor and identified that information pertaining to certain current and former patients and/or their guarantor(s) was present in the affected files, including you. Since then, we have been performing additional work to review and verify the affected information as well as locate address information in order to provide direct notice to as many impacted individuals as possible.

### What Information Was Involved?

---

[10] Privacy Policy, PTW, https://www.ptow.com/ptow-formsandpolicies.php (last visited March 3, 2024).
[11] Notice of Privacy Practices, MAWC, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.midatlanticwomenscare.com/wp-content/uploads/2022/10/Mid-Atlantic-Womens-Care-Notice-of-Privacy-Practices-Document.pdf (last visited July 16, 2024).
[12] Exhibit A.
[13] Defendant is a division of Mid-Atlantic Women's Care, PLC ("MAWC")

Our review determined that the following types of information were present in the affected files that were accessed and acquired by the unauthorized actor: your name, Social Security number, date of birth, and medical/health information. Although the investigation was unable to confirm whether your information was actually viewed by the unauthorized actor, we are unable to rule out this possibility. Please note that we are not aware any actual or attempted fraudulent misuse of information as a result of this incident.

**What We Are Doing?**

The confidentiality, privacy, and security of personal information is among our highest priorities, and we have strict security measures in place to protect information in our care. Upon becoming aware of this incident, we immediately took steps to secure our systems and performed a full investigation. We have implemented additional security measures to further protect against similar incidents moving forward. Federal law enforcement is aware of this incident, and we also notified applicable regulators, including the U.S. Department of Health and Human Services. Additionally, we are offering you credit monitoring and identity theft protection services for 12 months through Experian, at no cost to you. The deadline to enroll in these services in March 31, 2024. Please note that you will not be automatically enrolled in these services. Should you wish to do so, you will need to enroll yourself in these services, as we are not able to do so on your behalf. You may find instructions on how to enroll in these services in the enclosed *Steps You Can Take to Help Protect Personal Information.*

36.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

37.     The attacker accessed and acquired files in Defendants' computer systems containing unencrypted Private Information of Plaintiffs and Class members, including their names, Social Security numbers, date of birth, and medical/health information. Plaintiffs' and Class members' Private Information was accessed and stolen in the Data Breach.

38.     Plaintiffs further believe their Private Information, and that of Class members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

39.     The notorious LockBit 3.0 ransomware gang claimed responsibility for the cyberattack on June 7, 2023. LockBit 3.0 is one of the most active ransomware actors, having breached over 1,000 companies worldwide[14] and PTOW knew or should have known of the tactics that groups like LockBit 3.0 employ.



40.     With the Private Informaiton secured and stolen by LockBit 3.0, the hackers then purportedly issued a ransome demand to PTOW. However, PTOW has provided no public information on the ransom demand or payment.

41.     On information and belief, on May 5, 2023, the presume deadline of LockBit 3.0's ransome demand, LockBit 3.0 released the "full database of medical records for all patients" on a data leak page.

---

[14]LockBit Hackers, BloomBerg, https://www.bloomberg.com/news/articles/2023-02-02/lockbit-hackers-behind-ion-breach-also-hit-royal-mail-hospital (last visited June 13, 2023).



42.     On or around January 26, 2024 – atleast **_nine_** months after the Breach first occurred-

PTOW finally began notifying Class members about the Data Breach.

***Defendants Acquire, Collect, and Store Plaintiffs' and Class Members' Private Information***

43.     As a condition to obtain medical services from Defendants, Plaintiffs and Class members were required to give their sensitive and confidential Private Information to Defendants.

44.     Defendants retain and store this information and derive a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiffs' and Class members' Private Information, Defendants would be unable to perform their services.

45.     By obtaining, collecting, and storing the Private Information of Plaintiffs and Class members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

46.     Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendants to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

47.     Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class members.

48.     Upon information and belief, Defendants made promises to Plaintiffs and Class members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

49.     Defendants' negligence in safeguarding the Private Information of Plaintiffs and Class members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

***Defendants Knew or Should Have Known of the Risk of a Cyber Attack Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable to Cyber Attacks***

50.    Data thieves regularly target entities in the healthcare industry like Defendants due to the highly sensitive information that they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

51.    Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities like Defendants that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

52.    In light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

53.    For example, of the 1,862 recorded data breaches in 2021, 330 of them, or 17.7%, were in the medical or healthcare industry.[15]

54.    The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[16]

---

[15] 2021 Data Breach Annual Report (ITRC, Jan. 2022), https://notified.idtheftcenter.org/s/, at 6.
[16] *Id*.

55.     Entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[17] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[18] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. 40 percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[19]

56.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiffs and Class members from being compromised.

57.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[17] *See* Identity Theft Resource Center, *2022 Annual Data Breach Report*, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last accessed Feb. 13, 2024).
[18] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Feb 13, 2024).
[19] *See id.*

58.     The injuries to Plaintiffs and Class members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class members.

59.     The ramifications of Defendants' failure to keep secure the Private Information of Plaintiffs and Class members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

60.     As a healthcare entity in possession of their Patients' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class members because of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

### *Defendants Failed to Comply with FTC Guidelines*

61.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

62.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer

networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[20]

63.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[21]

64.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

65.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

66.     These FTC enforcement actions include actions against healthcare entities, like Defendants. *See, e.g.*, *In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's

---

[20] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Feb. 13, 2024).
[21] *Id.*

data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

67.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

68.     Defendants failed to properly implement basic data security practices.

69.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act,15 U.S.C. § 45.

### *Defendants Failed to Comply with HIPAA Guidelines*

70.     Defendants are covered businesses under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

71.     Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[22] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

---

[22] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

72.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

73.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

74.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

75.     "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

76.     HIPAA's Security Rule requires Defendants to do the following:

   a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d.  Ensure compliance by their workforce.

77.     HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to

17

those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

78.    HIPAA and HITECH also obligates Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

79.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

80.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

81.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance

Material.[23] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[24]

***Defendants Owed Plaintiffs and Class Members a Duty to Safeguard their Private Information***

82.     In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class members.

83.     Defendants owed a duty to Plaintiffs and Class members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

84.     Defendants owed a duty to Plaintiffs and Class members to implement processes that would detect a compromise of Private Information in a timely manner.

85.     Defendants owed a duty to Plaintiffs and Class members to act upon data security warnings and alerts in a timely fashion.

---

[23] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed Feb. 13, 2024)

[24] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last accessed Feb 13, 2024).

86.     Defendants owed a duty to Plaintiffs and Class members to disclose in a timely and accurate manner when and how the Data Breach occurred.

87.     Defendants owed a duty of care to Plaintiffs and Class members because they were foreseeable and probable victims of any inadequate data security practices.

### *The Data Breach Increases Plaintiffs' and Class members' Risk of Identity Theft*

88.     The unencrypted Private Information of Plaintiffs and Class members will end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of hackers.

89.     Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class members.

90.     Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class members because of the Data Breach.

91.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

92.     Plaintiffs' and Class members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class members and to profit from their misfortune.

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

93.     As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

94.     Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class members must monitor their financial accounts for many years to mitigate the risk of identity theft.

95.     Plaintiffs and Class members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

96.     Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25]

97.     Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

---

[25] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed Feb. 13, 2024).

contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

98.     And for those Class members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

### *Diminution of Value of Private Information*

99.     Private Information is valuable property.[27] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

100.    The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

101.    This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black

---

[26] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last accessed Feb 13, 2024).

[27] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed Feb. 13, 2024) ("GAO Report").

market."[28]

102.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[29]

103.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[30] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[31,32] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[33]

104.    As a result of the Data Breach, Plaintiffs' and Class members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the

---

[28] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Feb. 13, 2024).

[29] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[30] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed Feb. 13, 2024).

[31] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed Nov. 10, 2023).

[32] https://datacoup.com/ (last accessed Feb. 13, 2024).

[33] https://www.thepennyhoarder.com/make-money/nielsenpanel/#:~:text=Sign%20up%20to%20 join%20the,software%20installed%20on%20your%20computer (last accessed Feb. 13, 2024).

data has been lost, thereby causing additional loss of value.

105.    The fraudulent activity resulting from the Data Breach may not come to light for years.

106.    Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

107.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

108.    The injuries to Plaintiffs and Class members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class members.

### *The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary*

109.    Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

110.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

111.     Consequently, Plaintiffs and Class members are at an increased risk of fraud and identity theft for many years into the future.

112.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class member. This is a reasonable and necessary cost to monitor and protect Class members from the risk of identity theft resulting from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class members would not need to bear, but for Defendants' failure to safeguard their Private Information.

### Loss of the Benefit of the Bargain

113.     Furthermore, Defendants' poor data security deprived Plaintiffs and Class members of the benefit of their bargain. When agreeing to pay Defendants for the provision of their services, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

*Plaintiff Johnson's Experience*

114.    Plaintiff Johnson obtained medical services from PTOW. To obtain these medical services, she was required to provide her Private Information to PTOW.

115.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Johnson's Private Information in their system.

116.    Plaintiff Johnson is very careful about sharing her sensitive Private Information. Plaintiff Johnson stores any documents containing her Private Information in a safe and secure location. Plaintiff Johnson has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

117.    Plaintiff Johnson learned of the data breach after receiving the Notice. According to the Cybersecurity, Plaintiff Johnson's Private Information was improperly accessed and obtained by unauthorized third parties. The Private Information comprised her name, Social Security number,  date of birth and medical/health information.

118.    As a result of the Data Breach, Plaintiff Johnson made reasonable efforts to mitigate the impact of the Data Breach, including checking her bills and accounts to make sure they were correct. Plaintiff Johnson has spent significant time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

119.    As a result of the Data Breach, Plaintiff Johnson fears for her personal financial security and uncertainty over what medical information was revealed in the Data Breach. she is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

120. As a result of the Data Breach, Plaintiff Johnson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

121. As a result of the Data Breach, Plaintiff Johnson is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

122. Plaintiff Johnson has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff Hall's Experience

123. Plaintiff Hall is a patient of PTOW. To obtain medical services from PTOW, she was required to provide her Private Information to PTOW.

124. Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Hall's Private Information in their system.

125. Plaintiff Hall is very careful about sharing her sensitive Private Information. Plaintiff Hall stores any documents containing her Private Information in a safe and secure location. Plaintiff Hall has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

126. Plaintiff Hall learned of the data breach after receiving the Notice. According to the Cybersecurity, Plaintiff Hall's Private Information was improperly accessed and obtained by unauthorized third parties. The Private Information comprised her name, Social Security number, date of birth and medical/health information.

127. As a result of the Data Breach, Plaintiff Hall made reasonable efforts to mitigate the impact of the Data Breach, including checking her bills and accounts to make sure they were

correct. Plaintiff Hall has spent significant time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

128.    As a result of the Data Breach, Plaintiff Hall fears for her personal financial security and uncertainty over what medical information was revealed in the Data Breach. she is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

129.    As a result of the Data Breach, Plaintiff Hall anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

130.    As a result of the Data Breach, Plaintiff Hall is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

131.    Plaintiff Hall has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Trupia-Lash's Experience*

132.    Plaintiff Trupia-Lash is a patient of PTOW. To obtain medical services from PTOW, she was required to provide her Private Information to PTOW.

133.    Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff Trupia-Lash's Private Information in their system.

134.    Plaintiff Trupia-Lash is very careful about sharing her sensitive Private Information. Plaintiff Trupia-Lash stores any documents containing her Private Information in a

safe and secure location. Plaintiff Trupia-Lash has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

135.    Plaintiff Trupia-Lash learned of the data breach after receiving the Notice. According to the Cybersecurity, Plaintiff Trupia-Lash's Private Information was improperly accessed and obtained by unauthorized third parties. The Private Information comprised her name, Social Security number,  date of birth and medical/health information.

136.    As a result of the Data Breach, Plaintiff Trupia-Lash made reasonable efforts to mitigate the impact of the Data Breach, including checking her bills and accounts to make sure they were correct. Plaintiff Trupia-Lash has spent significant time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

137.    As a result of the Data Breach, Plaintiff Trupia- Lash has experienced an increase in phishing calls.   Plaintiff Trupia-Lash has spent significant time blocking and reporting these phshing calls. This time has been lost forever and cannot be recaptured.

138.    As a result of the Data Breach, Plaintiff Trupia-Lash fears for her personal financial security and uncertainty over what medical information was revealed in the Data Breach. she is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

139.    As a result of the Data Breach, Plaintiff Trupia-Lash anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

140.     As a result of the Data Breach, Plaintiff Trupia-Lash is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

141.     Plaintiff Trupia-Lash has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

## V.     CLASS ACTION ALLEGATIONS

142.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of a class defined as:

> All individuals whose PII and/or PHI was accessed and/or acquired by an unauthorized party in the Data Breach, including all who were sent a notice of the Data Breach.

143.     Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

144.     Plaintiffs reserve the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

145.     **Numerosity.** The Class Members are so numerous that joinder of all members is impracticable. Upon information, over 147,000 individuals had their PII compromised in this Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

146.     **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common

30

questions of law and fact include, without limitation:

    a.  Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiffs and Class members;

    b.  Whether Defendants had respective duties not to disclose the Private Information of Plaintiffs and Class members to unauthorized third parties;

    c.  Whether Defendants had respective duties not to use the Private Information of Plaintiffs and Class members for non-business purposes;

    d.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiffs and Class members;

    e.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    f.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

    g.  Whether Plaintiffs and Class members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct; and

    h.  Whether Plaintiffs and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

147.  **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach.

148.  This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members

and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

149.     **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' Counsel is competent and experienced in litigating Class actions, including data privacy litigation of this kind.

150.     **Predominance.** Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

151.     **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

152.    Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

153.    Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

a.  Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b.  Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

c.  Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d.  Whether Defendants' failure to institute adequate protective security measures amounted to breach of an implied contract;

e.  Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.  Whether adherence to HIPAA and FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

154.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## VI.    CAUSES OF ACTION

<u>COUNT I</u>
**NEGLIGENCE**
**(On behalf of Plaintiffs and all Class Members)**

155.    Plaintiffs hereby repeat and reallege paragraphs 1 through 155 of this Complaint and incorporates them by reference herein.

156.    Defendants require their Patients, including Plaintiffs and Class members, to submit non-public Private Information in the ordinary course of providing health services.

157.    Defendants gathered and stored the Private Information of Plaintiffs and Class members as part of their business of soliciting their services to their Patients, which solicitations and services affect commerce.

158.    Plaintiffs and Class members entrusted Defendants with their Private Information with the understanding that Defendants would safeguard their information.

159.    Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class members could and would suffer if the Private Information were wrongfully disclosed.

160.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Class members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which the could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

161.     Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

162.     Defendants owed a duty of care to Plaintiffs and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

163.     Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Patients. That special relationship arose because Plaintiffs and Class members entrusted Defendants with their confidential Private Information, a necessary part of being Patients of Defendants.

164.     Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

165.     Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs or the Class.

166.     Defendants breached their duties, thus were negligent, by failing to use reasonable measures to protect Class members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, (a) failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information; (b) failing

to adequately monitor the security of their networks and systems; and (c) allowing unauthorized access to Class members' Private Information.

167.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly considering Defendants' inadequate security practices.

168.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class members' Private Information would result in injury to Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

169.    Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class members could and would suffer if the Private Information were wrongfully disclosed.

170.    Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and Class members, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants' systems.

171.    It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

172.    Plaintiffs and Class members had no ability to protect their Private Information that was in, and likely remains in, Defendants' possession.

173.    Defendants were in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

174.     Defendants' duty extended to protecting Plaintiffs and Class members from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

175.     Defendants have admitted that the Private Information of Plaintiffs and Class members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

176.     But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class members, the Private Information of Plaintiffs and Class members would not have been compromised.

177.     There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiffs and Class members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class members. The Private Information of Plaintiffs and Class members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

178.     As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to

their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

179.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

180.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

181.    Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

182.    Plaintiffs and Class members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class members.

**<u>COUNT II</u>**
**NEGLIGENCE *PER SE***
**(On behalf of Plaintiffs and all Class Members)**

183.    Plaintiffs hereby repeat and reallege paragraphs 1 through 155 of this Complaint and incorporates them by reference herein.

184.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' Private Information.

185.    Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendants had a duty to implement reasonable safeguards to protect Plaintiffs' and Class members' Private Information.

186.    Pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

187.    Defendants breached their duties to Plaintiffs and Class members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' Private Information.

188.    Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se.*

189.    The injuries to Plaintiffs and Class members resulting from the Data Breach were directly and indirectly caused by Defendants' violation of the statutes described herein.

190.    Plaintiffs and Class members were within the class of persons the Federal Trade Commission Act and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

191.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class members, Plaintiffs and Class members would not have been injured.

192.     The injuries and harms suffered by Plaintiffs and Class members were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that Defendants' breach would cause Plaintiffs and Class members to experience the foreseeable harms associated with the exposure of their Private Information.

193.     As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

<u>COUNT III</u>
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiffs and all Class Members)**

194.     Plaintiffs hereby repeat and reallege paragraphs 1 through 155 of this Complaint and incorporates them by reference herein.

195.     Plaintiffs and the other Class members gave Defendants their PII and PHI believing that Defendnts would protect that information. Plaintiffs and the other Class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiffs' and the other Class members' PII and PHI created a fiduciary relationship between Defendants on the one hand, and Plaintiffs and the other Class members, on the other hand, and Plaintiffs and the other Class members, on the other hand. In light of this relationship, Defendants must act primarily for the benefit of their patients, which includes safeguarding and protecting Plaintiffs' and the other Class members' PII and PHI.

196.     Due to the nature of the relationship between Defendants and Plaintiffs and the other Class members, Plaintiffs and the other Class members were entirely reliant upon Defendants to ensure that their PII and PHI was adequately protected. Plaintiffs and the other Class members

had no way of verifying or influencing the nature and extent of Defendants' or their vendors' data security policies and practices, and Defendants were in an exclusive position to guard against the Data Breach.

197.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and the other Class members upon matters within the scope of their relationship. They breached that duty by contracting with companies that failed to properly protect the integrity of the systems containing Plaintiffs' and the other Class members' PII and PHI, failing to comply with the data security guidelines set forth by HIPPA, and otherwise failing to safeguard Plaintiffs' and the other Class members' PII and PHI that they collected.

198.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and the other Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII and PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII and PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII and PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII and PHI compromised as a result of the Data breach; (vii) loss of potential value of their PII and PHI; (viii) overpayment for the services that were received without adequate data security.

<u>**COUNT IV**</u>
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and all Class Members)**

199.    Plaintiffs hereby repeat and reallege paragraphs 1 through 155 of this Complaint and incorporates them by reference herein.

200.    Defendants offered to provide services to their Patients, including Plaintiffs and Class members, in exchange for payment.

201.    Defendants also required Plaintiffs and the Class members to provide their Private Information to receive services.

202.    In turn, Defendants impliedly promised to protect Plaintiffs' and Class members' Private Information through adequate data security measures.

203.    Plaintiffs and the Class members accepted Defendants' offer by providing Private Information to Defendants in exchange for receiving their services, and then by paying for and receiving the same.

204.    Plaintiffs and Class members would not have entrusted their Private Information to Defendants but for the above-described agreement with Defendants.

205.    Defendants materially breached their agreement(s) with Plaintiffs and Class members by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement.

206.    Plaintiffs and Class members have performed under the relevant agreements, or such performance was waived by the conduct of Defendants.

207.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in

connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

208.    Defendants' conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract.

209.    The losses and damages Plaintiffs and Class members sustained as described herein were the direct and proximate result of Defendants' breach of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

<b><u>COUNT V</u><br>UNJUST ENRICHMENT</b><br><b>(On behalf of Plaintiffs and all Class Members)</b>

210.    Plaintiffs hereby repeat and reallege paragraphs 1 through 155 of this Complaint and incorporates them by reference herein.

211.    This claim is pleaded in the alternative to the breach of implied contractual duty claim.

212.    Plaintiffs and members of the Class conferred a benefit upon Defendants in providing Sensitive Information to Defendants.

213.    Defendants appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and the Class. Defendants also benefited from the receipt of Plaintiffs' and the Class's Sensitive Information, as this was used to facilitate the treatment, services, and goods they sold to Plaintiffs and the Class.

214.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs and the Class's Sensitive Information because

43

Defendants failed to adequately protect their Sensitive Information. Plaintiffs and the proposed Class would not have provided their Sensitive Information to Defendants had they known Defendants would not adequately protect their Sensitive Information.

215.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and members of the Class all unlawful or inequitable proceeds received by them because of their misconduct and Data Breach.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class members, requests judgment against Defendants and that the Court grants the following:

A.  For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.  For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class members;

C.  For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class members, including but not limited to an order:

i.      prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.     requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii.     requiring Defendants to delete, destroy, and purge the Private Information of Plaintiffs and Class members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class members;

iv.     requiring Defendants to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class members;

**v.**     prohibiting Defendants from maintaining the Private Information of Plaintiffsand Class members on a cloud-based database;

vi.     requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.     requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.     requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix.     requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x.      requiring Defendants to conduct regular database scanning and security checks;

xiv.    requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.     requiring Defendants to meaningfully educate all Class members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

**xvi.**    requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct an attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment.

D.  For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

E.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.  For prejudgment interest on all amounts awarded; and

G.  Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:      July 24, 2024

Respectfully submitted,

*/s/Lee A. Floyd*
Lee A. Floyd (VSB #88459)
Sarah G. Sauble (VSB #94757)
**BREIT BINIAZAN, PC**
2100 E. Cary Street, Suite 310
Richmond, VA 23223
(804) 351-9040
(757) 670-3939
lee@bbtrial.com
sarah@bbtrial.com

Andrew J. Shamis, Esq. (*pro hac vice*)
**SHAMIS & GENTILE P.A.**
ashamis@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Tel: (305) 479-2299

Gary Klinger (*pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: 866-252-0878
gklinger@milberg.com

Raina Borrelli (*pro hac vice*)
**STRAUSS BORRELLI PLLC**
980 N Michigan Ave, Suite 1610
Chicago, IL 60611
Tel: (872) 263-1100
raina@straussborrelli.com

*Counsel for Plaintiffs and the Class.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2024, a true and correct copy of the foregoing was served through electronic mail on all counsel of record.


*/s/ Lee A. Floyd*
Lee A. Floyd